**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO.  23-00531-WB** |
| **EDWARD SCOTT ROCK** | : | |

### <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

Defendant Edward Scott Rock, a used car salesman in Northeast Philadelphia, advertised and accepted payment for, but failed to deliver, wheelchair accessible vehicles to dozens of unsuspecting customers. Rock repeatedly lied to clients, forged ADA compliance letters, fabricated excuses for non-delivery, sold the same vehicle to multiple buyers, stopped payment on refunds, and converted his victims' funds into cash.

Altogether, Rock fraudulently took in over $2.5 million from more than 100 victims over the course of 3 years. While some victims were subsequently refunded, often with money received from the scheme's later victims, over 70 victims remain unpaid and without their purchased vehicle, and more than $1.4 million in fraudulently obtained proceeds remains unreturned.

Rock's victims included persons with disabilities, elderly customers, medical transport companies, and senior living homes. Their victim impact statements talk openly of the deep and enduring harm, both emotional and financial, arising from Rock's unscrupulous conduct. Rock's victims were forced to take on second jobs, endure strained and broken marriages, lose business opportunities, experience depression, incur financing and legal debts, and struggle to assist their

family members with disabilities. All because they believed and trusted Rock, a jovial conman who used his fast-talking charm to pursue dishonest payouts instead of honest paydays.

A sentence of incarceration at the top of the Sentencing Guidelines range of 33 to 41 months' imprisonment is warranted in this case, to punish Rock for his multi-year, non-delivery scheme and to deter other businessmen who commit calculated fraud at the expense of their trusting victims.

## I.      BACKGROUND

### A.      Procedural History

On December 19, 2023, the grand jury returned an indictment charging Edward Scott Rock with eight counts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. On October 20, 2025, Rock appeared before this Court and entered a plea of guilty, pursuant to a written plea agreement, to one count of mail fraud (Count Two) and one count of wire fraud (Count Eight).

The Probation Office subsequently prepared a comprehensive Presentence Investigation Report (PSR), which outlined the offense conduct, determined the actual fraud loss to be $1,469,617, and correctly calculated the applicable Sentencing Guidelines as 33 to 41 months. PSR ¶¶ 17, 38, 102. There are no unresolved objections to the PSR or advisory Guidelines range.

### B.      Offense Conduct

Between at least February 2019 and January 2023, Rock sold used vehicles through two Northeast Philadelphia businesses, State Road Truck Sales LLC (SRTS) and ER Cars LLC (ER Cars). PSR ¶ 10. SRTS and ER Cars obtained used vehicles from automobile auctions, and then Rock would list and advertise the vehicles for sale online, including through Cars.com, Carsforsale.com, Ebay.com, Facebook.com, and Craigslist.com. *Id.* Rock was the primary

salesman for SRTS, which held a vehicle dealer license and owned a physical sales lot on State Road in Northeast Philadelphia. *Id.* In addition to earning commissions through SRTS, in 2019 Rock established and began selling vehicles through his own side business, ER Cars, to avoid having to pay SRTS a portion of his commissions.[1] While a portion of Rock's sales were legitimate, and some customers did receive their vehicles, a large number of his sales were also fraudulent in that Rock often sold used-vehicles which he did not possess, did not have title to, and could not provide. Most of the vehicles Rock sold to victims of the fraud scheme were through ER Cars and were accessible vehicles equipped for wheelchair users or people with disabilities. *Id.*

After executing Bills of Sale with SRTS and ER Cars, but before receiving their promised vehicles, victims remitted payment to Rock through wire transfers, cashier's checks, and personal checks. PSR ¶ 11. Although payment was accepted, Rock often did not deliver the vehicles as agreed upon, and in the instances where he did deliver a vehicle, Rock sometimes failed to provide the titling documents needed to use the vehicle. *Id.* In total, Rock defrauded

---

[1] Unlike SRTS, ER Cars did not maintain a vehicle dealer license. Rock established ER Cars in 2019 in his wife's name, opened bank accounts for ER Cars in his wife's name, and signed checks from ER Cars in his wife's name. Rock's wife was never involved with ER Cars or the fraudulent transactions, other than being listed as the nominee business owner and account holder. Rock also used his adult daughter's bank account, and wrote over $300,000 in checks out of his daughter's account, to further his fraud scheme.

Rock maintains that his father, who also worked for SRTS, was aware of the fraudulent sales and non-delivery scheme. But when interviewed by the FBI in March 2023, Rock admitted he never directly told his father that he was selling vehicles that could not be delivered. Although Rock's father did receive a portion of the sales commissions from the vehicles sold through ER Cars and SRTS, the investigation did not uncover evidence that anyone other than Rock (a) dealt with or lied to victims, (b) sold nonexistent vehicles to victims, (c) accepted and deposited victims' funds into the accounts of ER Cars, which Rock controlled, or (d) converted victims' funds into cash through the services of check-cashing operations.

over 100 victims across more than three dozen states. *Id.* While some of the earlier victims were subsequently refunded, often with money received from the scheme's later victims, 76 victims remained unpaid and without their purchased vehicle and title. *Id.*

On several different occasions, Rock sold the same vehicle to multiple customers. After agreeing to sale terms and accepting payment from a customer for a particular vehicle, Rock continued to list, sell, and accept payment for that same vehicle again, this time from a new client-victim. PSR ¶ 12. In one instance, Rock agreed to sell a particular vehicle – a wheelchair-accessible 2017 Ford T150 van – to 16 different customers over an 11-month period between February 2022 and January 2023. *Id.* Despite accepting more than $336,000 in total payments from multiple buyers for this same specific vehicle, Rock only delivered the vehicle to one of those customers (albeit without proper title). *Id.* To induce buyers to purchase, Rock also occasionally used a forged letter to falsely certify that a vehicle listed for sale was compliant with the Americans with Disabilities Act (ADA) and had undergone a conversion with a reputable manufacturer of wheelchair-accessible vehicles. *Id.*

When customers complained and attempted to recoup their funds or threatened to report Rock to the police, Rock sometimes provided refund checks, but he would also often stop payment on those checks or request that customers not deposit the checks due to insufficient funds. PSR ¶ 13. Although Rock ultimately paid back some of his earliest and most insistent victims, he did so in large part with the funds secured from his later clients, which in turn further enabled and expanded his fraud. *Id.*[2]

---

[2] These victim repayments are not indicative of good faith mitigation – they were made by Rock only after victims involved legal counsel, threatened to report Rock to law enforcement, or visited Rock in person to demand a refund. By distributing a portion of new client funds to

*continued* . . .

In early December 2022, the owner of SRTS, M.T., and Rock's father noticed that some vehicles were missing from SRTS' sales lot. They reported these vehicles as missing to the police, parted ways with Rock, and closed down SRTS. Although SRTS was shuttered and Rock lacked access to the vehicles, titles, and SRTS' dealership license, he continued to sell non-existent vehicles on his own in late December 2022 and January 2023, before being confronted by police on January 11, 2023.[3]

Rock spent a portion of his victims' money on personal expenses, including his mortgage, children's school tuition, utilities, and gambling debts. PSR ¶ 13.[4] Rock also regularly wrote large checks to himself from the ER Cars account and used check-cashing services to convert the majority of his victims' funds into cash. *Id.* Rock used these check-cashing services to obtain hundreds of thousands of dollars in cash each month. *Id.* While some of the cash was

---

refund the most persistent of his previously defrauded clients, Rock was able to keep his fraud scheme afloat for a bit longer and leave additional victims in his wake. This pattern of conduct also explains why the victims who remain unpaid are bunched at the tail end of the fraud scheme period – 54 of the 76 unpaid victims were defrauded in the second half of 2022, right before law enforcement intervened in January 2023.

[3] This included accepting $19,000 from victim S.O. on December 16, 2022, $8,000 from victim M.S. on December 20, 2022, $26,500 from victim F.M. Transportation on December 20, 2022, $9,000 from victim P.D. on December 21, 2022, $5,000 from victim Z.P. on December 21, 2022, $15,000 from victim M.H. on December 22, 2022, $11,500 from victim H.A. on December 27, 2022, $18,500 from victim S.N. on December 29, 2022, $16,500 from victim D.J. on January 3, 2023, $21,000 from victim G.H. on January 4, 2023, $13,000 from victim S.S. on January 4, 2023, and $36,500 from victim L.S. on January 6, 2023. These fraudulent sales all occurred after Rock split with both his father and with SRTS. These victims all remain unpaid and without their vehicle and title.

[4] Rock continued to spend victim funds even after he was interviewed by the local police in January 2023, and then by the FBI in March 2023, who confronted Rock with evidence of his fraudulent non-delivery scheme. On May 25, 2023, for example, Rock deposited a $61,623 check consisting of victim funds released by his bank. Within six weeks, Rock spent the entirety of those funds, with the majority going to consumer purchases and other personal expenses.

used to pay sales commissions, reimburse SRTS, purchase vehicles, and repay prior clients, much of the cash remains unaccounted for.

### C.     Loss Amount and Victim Restitution

The actual loss amount from Rock's fraud scheme was $1,469,617. PSR ¶¶ 18, 38; USSG § 2B1.1 Application Note 3(B) ("The court need only make a reasonable estimate of loss."). A chart of the loss and restitution amounts is attached as Appendix A, which reflects the unpaid principal sum owed to each victim, minus all known repayments. This actual loss amount was determined through a multi-step process that involved reviewing and following-up on victim complaints to local, state, and federal authorities, analyzing the financial records of ER Cars, SRTS, and Rock to verify victim payments and refunds, and locating corroborating support from witness and victim statements, Rock's interviews, and Rock's phone and email accounts. Victims who were either fully repaid or received their vehicle and title prior to the indictment date were not included in Appendix A. To date, only one of the 76 unpaid victims has been verified as fully repaid post-indictment, which has been reflected in Appendix A.[5]

This Court must order victim restitution. 18 U.S.C. § 3663A; PSR ¶ 115. Appendix A provides a chart containing the 76 victims' respective restitution amounts based on the fraud loss, totaling $1,457,617, after accounting for Rock's repayment to victim R.B. through the Utah court judgment. If Rock provides documentary proof of additional victim repayments, this

---

[5] Victim R.B. was paid back through a court-ordered judgment entered in Utah. PSR ¶¶ 49-51. The FBI spoke with R.B. and his accountant in early 2026 and confirmed that repayment was completed in October 2025. While the post-indictment repayments to R.B. are factored into the victim restitution figure, they do not change the overall loss amount. *See* USSG § 2B1.1 App. Note 3(D)(i) (credits against loss only apply if the repayment occurred "before the offense was detected" by a victim or government agency). The court-ordered payments to victim R.B. occurred only after both state and federal investigators had approached and interviewed Rock, and after a court-judgment was issued in Utah.

restitution amount can be reduced accordingly.

As part of his plea agreement, Rock also agreed to the entry of a forfeiture money judgment on Counts One and Two. PSR ¶ 4. The forfeiture amount is $1,469,617 for Counts One and Two.

### D. <u>Victim Impact Statements</u>

Sixteen victim impact statements were received. Appendix B; PSR ¶¶ 19-30.[6] These statements reveal the economic hardship Rock's fraud scheme caused – victims lost their life savings, took on second jobs, lost business opportunities, incurred additional debt, and struggled to keep their small companies afloat. *See, e.g.*, "J.T. Victim Impact Statement" (describing the financial strain exacerbated by the breakdown of their son's wheelchair vehicle without the ability to replace it); "J.M. Victim Impact Statement" (explaining the loss of a major transport contract and his continued struggle to pay uncollateralized loan at a high interest rate on the undelivered vehicles). The statements also revealed that Rock's fraud negatively impacted victims' mental health and personal relationships and caused them to lose their trust in others. *See, e.g.*, "B.Q. Victim Impact Statement" (explaining that he is on the verge of divorce and unable to pay his bills due to the non-delivery); "A.K. Victim Impact Statement" (describing how Rock's betrayal caused him to suffer from depression and lose trust in others, and ruined his plans for the future).

The impact felt by these individuals and small businesses is raw, personal, and above all, undeniable. Rock scammed hardworking people and left them with crippling debt. His victims

---

[6] Five of these impact statements (from victims A.K., K.F., A.C., M.W., and Y.A.) were received in May 2026 following the issuance of the PSR.  The other eleven impact statements are referenced in the PSR.

worked to provide for themselves and their families; they hoped to improve their quality of life. Rock's fraud undermined their hard work, exploited their trust, unsettled what they had built in their lives, and created significant impediments for their future livelihoods.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence

For each of Counts Two and Eight (mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343, respectively), the statutory maximum sentence is 20 years' imprisonment, three years' supervised release, a $250,000 fine, and a $100 special assessment. The total maximum sentence is: 40 years' imprisonment, a three-year period of supervised release, a fine of $500,000, and a $200 special assessment.

### B.    Sentencing Guidelines Calculation

The Probation Office correctly calculated Rock's advisory Guidelines range as 33 to 41 months' imprisonment. PSR ¶ 102. This range is calculated as follows: the base offense level for mail and wire fraud is 7, which is increased by 14 offense levels because the actual fraud loss of $1,469,617 exceeds $550,000 but is less than $1,500,000, pursuant to USSG § 2B1.1(b)(1). *Id.* ¶¶ 37-38. Two additional offense levels are added because the defendant defrauded ten or more victims and caused substantial financial hardship to one or more victims, pursuant to USSG § 2B1.1(b)(2)(A). *Id.* ¶¶ 5, 39. With a three-level reduction under USSG §§ 3E1.1(a) and (b) for acceptance of responsibility, the final total offense level is 20. *Id.* ¶¶ 44-47.

The final offense level is 20, and Rock's criminal history category is I,[7] which yields the

---

[7] Rock received no criminal history points. PSR ¶ 49. However, he is not entitled to an additional zero-point offender reduction pursuant to USSG § 4C1.1 because he personally caused substantial financial hardship to at least one victim. *See* USSG § 4C1.1(a)(6); PSR ¶ 17 n.7.

advisory Guidelines range of 33 to 41 months' incarceration. *Id.* ¶¶ 47, 52, 102.

### III.   ANALYSIS

A sentence at the top of the Guidelines of 33 to 41 months' imprisonment is warranted to punish defendant Edward Scott Rock for his years-long non-delivery scheme and to deter other licensed professionals who commit predatory financial fraud at the expense of their clients.

Several aggravating circumstances support this sentence. First, and most importantly, Rock victimized dozens of disadvantaged individuals and small businesses, causing lasting financial and psychological harm. Second, Rock had the capacity and skill to earn money legitimately but chose instead to exploit and defraud his clients, notwithstanding his prior bad experience involving similar conduct with Exim Auto. Third and finally, this was not a one-off offense, but a years-long scheme fed by repeated lies and expanding falsehoods that continued well after Rock knew he could not deliver the vehicles or provide a refund.

#### A.   Legal Standard

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion)) (ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition to considering the Guidelines, this Court must also consider all the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). Simply stated, Section 3553(a) factors require the Court to focus on both the offense and the offender, and to consider factors of retribution, deterrence, incapacitation, and rehabilitation. *Tapia v. United States*, 564 U.S. 319, 325 (2011) (explaining 18 U.S.C. § 3553(a)).

A. **The Nature and Circumstances of the Offense**

The conduct here is serious. Rock carried out a multi-year, non-delivery scheme that caused 76 customers to lose more than $1.4 million. Again and again, Rock lied to clients and took their money while misrepresenting his ability to deliver the modified accessible vans they desperately needed for their families and businesses. His conduct went beyond grey-area sales tactics – he falsified ADA certification letters, fabricated non-delivery excuses, passed bad refund checks, and used family bank accounts and check-cashing services to dissipate the assets. Most brazenly, he repeatedly sold the same vehicles (with unique Vehicle Identification Numbers) to multiple customers – in one instance, selling a single van to 16 different purchasers

- 10 -

– knowing full well that only one of them could drive away with the vehicle, leaving the others empty-handed. And at the very end, after his partners shuttered the business and reported him to the police, Rock continued on alone, selling non-existent vehicles without a dealership license, without vehicles, and without titles.

Financial fraud committed at the expense of unsuspecting victims is both criminal and despicable. *United States v. Carver*, 916 F.3d 398, 404 (4th Cir. 2019) ("Financial fraud is a modern scourge. It preys especially upon the unsophisticated and vulnerable" and "harm[s] victims in almost irreparable ways by causing them loss of work, mental anguish, monetary loss, and loss of peace of mind."). Every dollar of the loss guideline applicable to Rock was a dollar he willfully and intentionally stole from a victim's pocket. He solicited and took money from victims knowing full well he could not provide them a vehicle as promised, and that he could never repay them. Rock's fraud scheme was serious, abused the trust of his clients, caused emotional and financial harm, and supports the requested sentence. No basis for leniency exists while more than 70 of Rock's fraud victims remain without the $1.4 million he stole from them.

## B.  **History and Characteristics**

Edward Scott Rock, age 50, is a longtime resident of Philadelphia, PA. He graduated with a degree in marketing from Drexel University in 2002. Rock is married and has three children, and has the support of much of his extended family. He has no prior criminal convictions. He has some history of gambling and alcohol consumption. Rock has also presented himself as remorseful, refunding many victims and taking responsibility for his actions. His personal accountability and lack of previous criminal history are already reflected in the offense level reductions and criminal history category applied to the sentencing calculation; they warrant no further leniency.

As a college graduate and licensed salesman, Rock had the capacity to, and did, earn money legitimately. Rock reported earning a six-figure salary as a home improvement salesman both before and after engaging in the non-delivery fraud scheme. His prior successes and abilities do not make him less culpable than the average offender; they instead make him more culpable (and his crimes more volitional) because he chose crime despite having all the tools to excel without it. *United States v. Morgan*, 635 F. App'x 423, 445 (10th Cir. 2015) ("Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." (quoting *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999))). This is especially the case here, where the majority of Rock's victims were not local, not affluent, and not native-English speakers. Rock used these geographic, language, and cultural barriers to his advantage when fabricating non-delivery excuses, avoiding repayment, and carrying out his fraud scheme.

As noted in the PSR, Rock and his father previously operated a used car business (Exim Auto) in New Jersey between 2012 and 2014. PSR ¶¶ 71, 91-95, 119. Although no criminal charges were filed, the parallels are striking – vehicles went missing, customers reported being scammed, and Exim Auto went out of business. *Id.* Yet, despite the customer complaints and financial troubles that plagued Exim Auto, just a few years later, Rock went right back to defrauding clients and selling cars he knew he could not deliver.

C. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law and Afford Adequate Deterrence.**

A term of imprisonment at the top of the Guidelines range is appropriate to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and "to afford adequate deterrence to criminal conduct" by others who would commit

similar offenses. 18 U.S.C. § 3553(a)(2); *Gall v. United States*, 552 U.S. 38, 54 (2007) (noting that it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

General deterrence is an especially important factor in white-collar crime cases such as this one. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotations omitted)); *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("We have previously emphasized the importance of general deterrence in white-collar crime."); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes.").

Many people rely on used car salesmen to purchase vehicles. When a salesman like Rock uses his license and industry know-how to deceive and exploit trusting consumers, especially ones in the market for scarce and indispensable mobility vans, the results can be devastating – victims are left without the vehicles that they depend on to function in society. For other licensed salesmen who may consider or are currently defrauding their clients, a meaningful sentence of incarceration here will make them think twice. This Court's sentence should send the message to businessmen that white-collar crime and predatory financial behavior – especially when carried out by system-advantaged perpetrators such as Rock, or when perpetrated against system-disadvantaged victims such as the elderly, families of persons with disabilities, or foreign-born residents with limited English – are taken seriously and have real consequences.

Notably, this was not a crime of necessity, or of mistake, or in lapse of judgment. This was a long-running crime of calculated choice. Rock sought out and selected his victims not

once, but repeatedly. He went to great lengths to deceive and defraud, fabricating ADA certification letters, relisting vehicles already sold, concocting elaborate excuses for nonpayment, using a nominee for his business accounts, and cycling money through his adult daughter's bank account and check-cashing operations. Rock took new funds from later victims to pay earlier clients, which propped up his scheme and concealed the misspent funds. Despite his history of engaging in similar conduct and the collapse of Exim Auto, Rock jumped right back in with ER Cars. In sum, a substantial sentence of incarceration is needed not only to provide specific and general deterrence, but also to promote respect for the law and impose a just punishment.

### D. <u>Unwarranted Sentencing Disparities</u>

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). A sentence within the Guidelines range will avoid unwarranted disparities with similarly situated defendants who have committed similar crimes.

Adherence to the recommended Guidelines range is especially important in fraud cases. *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) (noting that one of the key reasons for the creation of the fraud offense guidelines was the concern that "sentencing for white-collar crime had [become] ineffectual" and that white-collar criminals were sentenced less harshly);

- 14 -

*United States v. Hoffman*, 901 F.3d 523, 556-57 (5th Cir. 2018) ("Another problem with probation in multimillion dollar fraud cases is that it undermines public confidence in whether the justice system is 'do[ing] equal right to the poor and to the rich' as our oath requires.").

No case compares on all fours with this one, which presents an unusual combination of brazen misconduct and numerous individual victims that makes it dissimilar to run-of-the mill fraud cases. However, judges that have grappled with similar behavior and offenses have issued sentences at the higher end of the applicable Guidelines range. *See, e.g.*, *United States v. Shiraaz Sookralli*, No. 0:19-cr-60188-RS (S.D.Fl.  Feb. 13, 2020), ECF Nos. 69-71, 78 (former car salesman sentenced to 78 months' imprisonment for pleading guilty to conspiracy to commit mail and wire fraud arising from a non-delivery scheme that caused $3.89 million in losses for selling non-existent Porsche vehicles; advisory guideline range was 63 to 78 months); *United States v. Benjamin Grey,* No. 1:13-cr-00031-TNM (D.D.C. Jan. 17, 2014), ECF. Nos. 61, 79, 84 (car salesman who operated a fraudulent loan and vehicle non-delivery scheme sentenced to 102 months' imprisonment following trial convictions for bank and wire fraud and false loan applications that caused over $400,000 in losses; advisory guideline range was 84 to 105 months). These cases confirm that the requested multi-year, top of the Guidelines sentence for Rock remains appropriate and avoids sentencing disparities.

**F.    Supervised Release**

Pursuant to Sections 5D1.1 and 5D1.2 of the Sentencing Guidelines, as amended effective November 1, 2025, the Court is directed to conduct an "individualized assessment" when deciding whether to impose a term of supervised release, and if supervised release is imposed, how long the term should be. The guideline commentary, consistent with 18 U.S.C. § 3583(c), provides that the "individualized assessment" should rest on consideration of the same

sentencing factors under 18 U.S.C. § 3553(a) that are considered with respect to a term of imprisonment, with the exception of Sections 3553(a)(2)(A) (the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and 3553(a)(3) ("the kinds of sentences available"), which do not apply with regard to supervised release decisions.

In this case, a term of supervised release of at least two years is warranted, which would advance the goals of sentencing to deter criminal conduct, § 3553(a)(2)(B), protect the public, § 3553(a)(2)(C), and pay restitution to victims, § 3553(a)(7).

IV.     **CONCLUSION**

After factoring in all of the appropriate considerations, a sentence at the top of the Guidelines range of 33-41 months' imprisonment is warranted in this case, subject to the representations in the Sealed Supplement.

Respectfully Submitted,


/s/ Samuel S. Dalke
SAMUEL S. DALKE
JESSICA RICE
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Sentencing Memorandum has been served on the attorney

identified below via e-mail and ECF notification:

James McHugh
Federal Public Defender


/s/ Samuel S. Dalke
Assistant United States Attorney

Date:  May 28, 2026